UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SHIRLEY JN JOHNSON, individual,

CASE NO. 6:17-cv-710-Orl-37DCI

　　　　Plaintiff,

v.

NEW DESTINY CHRISTIAN CENTER
CHURCH, INC., Florida not for profit
corporation a/k/a Paula White Ministries, PAULA
MICHELLE WHITE, individually and in her
official capacity as President, Director and Senior
Pastor of New Destiny Christian Center Church,
Inc. a/k/a PAULA MICHELLE CAIN,

　　　　Defendants.

_____/

## DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT

Defendants NEW DESTINY CHRISTIAN CENTER CHURCH, INC. ("NDCC") and

PAULA MICHELLE WHITE, by and through their undersigned counsel, hereby file their Motion

for Final Summary Judgment and in support thereof state as follows:

## I.  Summary of Argument

As set forth more fully herein, summary judgment is appropriate, as (1) there is no dispute

of material fact as to whether Defendants had a *subjective* good faith belief that Plaintiff was

infringing their copyright material prior to submitting any of the Takedown Notifications at issue;

(2) Plaintiff's abuse of process claim is preempted by the DMCA and her claim under § 512(f);

(3) Defendant White was not directly involved in the actions giving rise to Plaintiff's claims; and

(4) there is insufficient evidence for Plaintiff's punitive damages claim to proceed to trial.

## II.  Background

Plaintiff, Shirley Jn Johnson, created and currently operates the website

http://www.theremnantsjnj.com/, which was built and ready for public consumption on

September 11, 2011. (Doc. # 66-1 at 10:14-16; 20:22-25-21:1-2). Her website contained and continues to contain a link to her YouTube channel, "theremnantsjnj", which she contends posts videos of televangelists, including Defendant White. (Id. at 10:20-24, 11:11-15). Her website also contains downloadable videos of televangelists, including Defendant White. (Id.). As to her YouTube channel, Plaintiff created the channel in 2011, and she is the current operator of the channel and is responsible for the content that appears on the channel. (Id. at 20:9-21).

The "YouTube page" on her website allows an individual to view her YouTube videos on her website. (Id. at 15:8-19). To that end, someone could visit her website, click on a title of a YouTube video and watch instantaneously, or the individual could download a copy of the video and watch at his/her leisure. (Id. at 15:20-25-16:1-8). The YouTube videos have been available on her website from at least March 2014, but it could have been as early as 2013. (Id. at 14:23-25-15:1-3; 149:9-23). Plaintiff has explained that some of the videos on her website are actually longer than the videos on her YouTube channel, as YouTube limits the length of videos. (Id. at 150:5-23). She has confirmed that while her YouTube videos were down, as detailed below, someone could have found the same videos on her website. (Id. at 150:24-15-151:1-6).

Plaintiff contends she has "lawfully used short clips of Defendant White's sermons which Plaintiff recorded from . . . Defendant's television and internet broadcasts." (Id. at 12:23-25-13:1-5). Plaintiff admits that she recorded videos of Defendant White giving sermons and posted portions of them on YouTube. (Id. at 185:24-25-185:1-7). She records videos off the internet – Paula White Ministries (PWM)/NDCC website – as the videos air. (Id.). She stores the content on her computer and then inserts the content into her own videos, which she posts on her YouTube channel. (Id. at 186:6-13). These videos were copyrightable property of PWM/NDCC[1] per the Digital Millennium

---

[1] On August 29, 2011, Paula Michelle Ministries, Inc. was formed as a 501(c)(3) entity. (Johnson I, Doc. # 163 at 2). On February 13, 2012, the PWM trade name was registered to PMMI. (Id. at 3). Defendant White was the incorporator and one

Copyright Act ("DMCA"). (See Digital Millennium Copyright Act of 1998). Ms. Johnson admits that before she posted any videos on her YouTube channel, she did not obtain permission from PWM/NDCC to use videos depicting its sermons. (Doc. # 66-1 at 147:25-148:1-10).

In January 2012, PWM sent YouTube a copyright notification submission (*i.e.*, Takedown Notification) that Ms. Johnson's videos used unauthorized reproduction of videos belonging to PWM. (Exhibit 1 at ¶ 25). On or about February 6, 2012, YouTube sent PWM and Ms. Johnson a notification that the unauthorized content was removed from Ms. Johnson's channel. (Id. at ¶ 27). Thereafter, on February 22, 2012, Plaintiff filed a counter-notification with YouTube requesting her content be reinstated. (Exhibit 2). Plaintiff's videos were subsequently restored on May 14, 2012. (Doc. # 66-1 at 145:4-25-146:1-3).

In June 2012, PWM applied for a copyright registration of 177 PWM sermons (videos) covering sermons given in 2010-2011. (Exhibit 1 at ¶ 5).

In 2013, Thomas Sadaka, Esquire, an attorney at the NeJame law firm, was asked to assist PWM with its efforts to enforce its copyrights in various videos depicting the ministry's sermons. (Exhibit 3 at ¶¶ 5, 8). Mr. Sadaka reviewed various videos that Plaintiff published through YouTube and on her website. (Id. at ¶¶ 8-9). These consisted of videos recorded by PWM. (Id.). In addition to reviewing the substance of the videos, Mr. Sadaka also verified that the videos were created by PWM, and that PWM had registered the copyrights for at least some of the videos in question. (Id.). During the course of his review, Mr. Sadaka considered whether Plaintiff's use of the videos constituted fair use. (Id. at ¶¶ 12-14). Mr. Sadaka concluded that Plaintiff was not merely using the videos to criticize or comment. (Id.). Rather, Mr. Sadaka believed that the "purpose and character" and "amount and substantiality" factors of the fair use test outweighed against a finding of fair use.

---

of the Directors of PMMI. (Id.). On May 2, 2014, the PWM trade name was registered to NDCC. (Id.). Defendant White is currently the President of the Board and Senior Pastor at NDCC. (Id.).

(Id.). It also appeared to Mr. Sadaka that Plaintiff was attempting to destroy the market for PWM's videos. (Id.). Therefore, Mr. Sadaka concluded that Plaintiff's use of the videos did not constitute fair use. (Id. at ¶ 13). Subsequently, on October 7, 2013, Mr. Sadaka sent Ms. Johnson a cease and desist letter indicating that her videos were infringing PWM's copyrights and requesting that she take down the material from YouTube. (Doc. # 31-5). Plaintiff refused, and on October 21, 2013, Ms. Johnson wrote a letter to Mr. Sadaka claiming fair use. (Doc. # 31-6).

## 1. Copyright Action

On March 27, 2014, Mr. Sadaka filed a copyright infringement action on behalf of PWM against Ms. Johnson. See *Paula White Ministries v. Shirley Jn Johnson*, Case No. 6:14-cv-497-ORL-31DAB ("Copyright Action").[2] On December 16, 2014, Ms. Johnson filed a motion for summary judgment. (Copyright Action, Doc. # 32). On January 2, 2015, while the Motion for Summary Judgment was pending, Mr. Sadaka, on behalf of PWM, filed a motion to dismiss, which Ms. Johnson opposed. (Id. at Doc. # 34). On January 12, 2015, the Court denied the motion to dismiss without prejudice noting, "under the circumstances, this case is in a posture where the outcome should be res judicata. This could result from pursuing the case to conclusion on the merits, or from Plaintiff's standpoint, a dismissal with prejudice would accomplish the same result." (Id. at Doc. # 36). Accordingly, the Court provided PWM until January 20, 2015 to either file a motion to dismiss with prejudice or its response to Ms. Johnson's motion for summary judgment. (Id.).

Subsequently, on January 13, 2015, Mr. Sadaka, on behalf of PWM, filed a motion to dismiss the Copyright Action with prejudice, noting it "believes it is in the best interest of judicial economy and in the best interest of the parties, to voluntarily dismiss this action, with prejudice, at this

---

[2] Pursuant to Fed. R. Evid. 201 (b), Defendants request that this Court take judicial notice of all filings from the Copyright Action as well as the Malicious Prosecution Action, which will be referred to as Johnson I. See Verizon Trademark Servs., LLC v. Producers, Inc., No. 8:10-cv-665-T-33EAJ, 2011 WL 308237, at *1 (M.D. Fla. Jan. 27, 2011)(noting that "a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

juncture[.]" (Id. at Doc. # 37). The dismissal was based on practical and economic reasons not bearing on the substantive merits. (Id.). Ms. Johnson opposed the motion on the basis that she claimed PWM's allegations against her were false and the "lawsuit [was] nothing more than malicious prosecution (SLAPP)." (Id. at Doc. # 38). On January 22, 2015, the Court granted PWM's motion to dismiss. (Id. at Doc. # 40). The Court's Order provided that Ms. Johnson could "pursue affirmative relief against [PWM] for malicious prosecution . . . by filing a separate complaint." (Id.). The Copyright Action was pending for approximately ten (10) months. (Id.).

### 2.  **Johnson I**

On October 8, 2015, Plaintiff filed a malicious prosecution action, along with allegations of 17 U.S.C. § 512(f) misrepresentation, abuse of process, and First Amendment violations against NDCC, Paula Michelle Ministries, Inc., Defendant White, and Resurrection Life THC, Inc. See *Shirley Jn Johnson v. New Destiny Christian Center Church, Inc., et al*, Case No. 6:15-cv-1698-ORL37-GJK ("Johnson I"). After several amendments, the Johnson I defendants filed a motion to dismiss on jurisdictional grounds. (Johnson I, Doc. # 86). Part of the motion required the Court to determine whether Plaintiff sufficiently stated a claim under § 512(f). (Id.). Upon review, the Court determined that "each factual allegation related to Johnson's damages stems from the prosecution of the Copyright Action rather than the removal of her videos from YouTube" and such omission was fatal to her § 512(f) claim and "underscored the Court's conclusion that Johnson intended only to assert a malicious prosecution claim in this action." (Johnson I, Doc. # 131 at 10). Therefore, the Court dismissed Plaintiff's § 512(f) claim without prejudice. (Id. at 23).

To support her punitive damages claim in Johnson I, Plaintiff concocted a theory that Defendant White intended to do harm to her by way of the Copyright Action, and therefore, that warranted the imposition of punitive damages. (Johnson I, Doc. # 76). In doing so, Plaintiff claimed under oath and in various Court filings that Defendant White was talking about Plaintiff in her

sermons when Defendant White used generic terms, such as "The Enemy." (Id.). However, Plaintiff admitted that Defendant White never specifically referred to her by name in any of the sermons Plaintiff used as support for her contention that Defendant White sought to damage her. (Johnson I, Doc. # 222 at 13). To the contrary, Plaintiff admitted that the term "The Enemy" is a common phrase used in the Evangelical community, which refers to Satan. (Johnson I, Trial Tran. V1 at 174:7-10).

After a two-day bench trial, and upon reviewing the evidence and post-trial filings, the Court entered an Order on July 31, 2018 awarding Plaintiff $13,707.93 in damages.[3] (Johnson I, Doc. ## 248-49, 264 at 15). The Court determined there was insufficient evidence to award Plaintiff punitive damages. (Id. at 17). In its Order, the Court discussed the videos Plaintiff presented at trial as evidence of Defendant White's alleged "malice" against her; specifically a sermon from May 1, 2016, which focused on John 13:34-35. (Id. at 7-10). As for the May 1, 2016 sermon, which Defendant White "admitted that she could have been speaking about Johnson when she was giving examples of situations to still love in and said, I can't call one out because I'm in a present case right now," the Court determined that the sermon did not indicate any malice from Defendant White directed to Plaintiff. (Id.)(internal quotations omitted). Rather, the sermon focused on "God's command to love others, even those who work against you or bring you difficult situations." (Id. at 9). The Court noted that Plaintiff did not prove Defendant White was referring to her in the other videos presented during the trial. (Id. at 10). On review, the Court determined that "while pursuit of the Copyright Infringement Action may have been motivated, in some part, by ill will towards Johnson, nonetheless, PWM relied on its counsel to investigate whether a good faith basis existed to support the copyright infringement claim." (Id. at 17).

---

[3] As for her economic damages, the parties had agreed that Plaintiff sustained $1,207.93 in economic damages for her cost from the Copyright Action. (Johnson I, Doc. # 264 at 15). The Court declined to award nominal damages, as economic injuries were stipulated to and proven. (Id.). As for her non-economic damages, the Court found that (1) Plaintiff was not entitled to non-economic damages for her claimed injury to character and reputation, but (2) Plaintiff was entitled to $12,500.00 for her claim of mental anguish. (Id. at 16).

### 3. __Present Action__

Plaintiff initiated this action on April 20, 2017 alleging misrepresentation under § 512(f) and abuse of process. (Doc. # 1). Defendants initially moved to dismiss Plaintiff's Complaint for failure to state a claim. (Doc. # 11). As for Plaintiff's § 512(f) claim, the Court determined that Plaintiff had presented sufficient facts to support a § 512(f) claim (*i.e.*, "Johnson again asserts damages stemming from prosecution of the Copyright Action in her complaint, but she also cites damages resulting from the termination of her YouTube channel"). (Doc. # 30 at 8).

Furthermore, the Court noted that "nestled" in her § 512(f) and abuse of process claims was an allegation that Defendants deprived Plaintiff of her First Amendment rights to free speech. (Id. at 8-9). Accordingly, the Court reiterated its position in Johnson I, that "should Johnson seek leave to amend her complaint, any attempt to assert a First Amendment claim against Defendants [will] be futile." (Id. at 9). Finally, the Court addressed Plaintiff's abuse of process claim, which was based on three occurrences: (1) Defendants' initiation of the Copyright Action; (2) Defendants' continuation of the Copyright Action after process had issued; and (3) Defendants' misuse of discovery tools in Johnson I. (Id. at 9-12). The Court found:

> To the extent Johnson seeks relief for Defendants' continuation of the Copyright Action *after* process had issued – that is, using the action to procure the permanent deletion of Johnson's YouTube channel – Johnson has sufficiently plead a claim for abuse of process. Notably, upon receiving information that the Copyright Act had been filed, YouTube notified Johnson that it could not honor her counter-notification to have her content reinstated. Johnson attached this notification to the Complaint. It can be reasonably inferred from this notification that Defendants were responsible for informing YouTube of the lawsuit. Moreover, the Complaint avers that Defendants continued the Copyright Action against Plaintiff with the "ulterior motive of using (or misusing) the Judicial System to intimidate, punish, sham, harass[,] and attempt to extort millions of dollars from [her]." As a result of these actions, Johnson asserts that she suffered damages, including the termination of her YouTube channel. Such allegations are all that is required to assert an abuse of process claim.

(Doc. # 30 at 10-12)(internal citations omitted)(emphasis in original). The Court determined that Plaintiff failed to explain how Defendants made improper use of the discovery process in <u>Johnson I</u>, and thus, she failed to state a claim for abuse of process on this ground. (<u>Id.</u>) On September 13, 2017, Plaintiff filed an Amended Complaint removing the deficiencies noted by the Court. (<u>See</u> Doc. # 31).

### a. __Takedown Notifications That Form Basis of § 512(f) Claim__

As discussed *supra*, PWM/NDCC recorded a series of sermons, and such videos received copyright protection at the time they were fixed in a tangible medium. (Exhibit 1 at ¶ 4, 7, 24). Plaintiff obtained copies of PWM's videos, and used those to create a series of videos, which she published to her own website and to YouTube. (Doc. # 66-1 at 185:24-25-186:1-7).

Plaintiff has admitted that she neither sought nor obtained permission from PWM to use PWM's videos to create her own videos or to upload such videos to the Internet, including her website and YouTube. (<u>Id.</u> at 147:14-25–148:1-10). During her deposition, Plaintiff claimed that she did not need PWM's permission to use PWM's videos because PWM had not registered its copyrights for the videos at the time she started using them. (<u>Id.</u>). Plaintiff also claimed that, based on her understanding, she did not need PWM's permission to use PWM's videos because her use fell within one of the exceptions for fair use.[4] (<u>Id.</u>).

Around the end of 2011 or beginning of 2012, Mr. Knight effectively became PWM's General Manager. (Exhibit 1 at ¶ 2). One of the tasks he undertook in that position was to address the widespread infringement of PWM's copyrights, particularly on YouTube. (<u>Id.</u> at ¶ 3). At the time, people were copying PWM's videos and then uploading the same videos to YouTube. (<u>Id.</u> at ¶ 8). Because of this infringing activity, some infringers' channels appeared before PWM's own

---

[4]  In her deposition, Plaintiff suggested that fair use is established where even just one of the elements enumerated in 17 U.S.C. § 107 is met. (Doc. # 66-1 at 54:10-15). However, Plaintiff is incorrect because all of the factors enumerated in § 107 must be considered when evaluating whether a particular use is a fair use. <u>See, e.g</u>, <u>Harper & Row</u>, 471 U.S. 539, 561 (1985).

channel on a YouTube search. (Id.). Since PWM was using advertising revenue on YouTube to offset some of the production costs of PWM's videos, PWM decided to take action to combat the infringement. (Id. at ¶ 9).

In an effort to understand PWM's options, and prior to PWM sending any of the Takedown Notifications, Mr. Knight researched a variety of sources and learned about the procedures under the DMCA, including what constitutes copyright infringement. (Id. at ¶ 10). In doing so, Mr. Knight became familiar with the fair use factors and analysis to evaluate whether a particular use is a fair use. (Id. at ¶ 13). Based on what he learned, Mr. Knight was under the impression that he needed to consider fair use before accusing someone of infringing PWM's videos. (Id. at ¶ 14). Thus, as PWM started to enforce rights in its videos in early 2012, Mr. Knight undertook a fair use analysis for each of the videos that PWM accused individuals, not just Plaintiff, of infringing. (Id. at ¶ 15).

Once Mr. Knight considered whether someone infringed, he would direct PWM's Web Content Manager, Antonio Taylor, to send Takedown Notifications. (Id. at ¶ 17). In total, PWM sent upwards of 100 Takedown Notifications to YouTube. (Id. at ¶ 18). The five Takedown Notifications at issue in this case were among the Takedown Notifications sent to YouTube, and are referred to by Plaintiff as follows: (1) February 5, 2012 Takedown Notification; (2) May 2, 2014 Takedown Notification; (3) July 1, 2014 Takedown Notification; (4) March 6, 2015 Takedown Notification; and (5) May 20, 2015 Takedown Notification. (Doc. # 66-1 at 24:10-25-25:1-2).

In the course of analyzing the fair use factors, Mr. Knight concluded that Plaintiff's videos were not commercialized, and thus, the first of the fair use factors weighed in her favor. (Johnson I, Trial Tran. V2 at 39:13-20). However, when considering the nature of work, Mr. Knight concluded that PWM's work was creative. (Exhibit 1 at ¶ 20). Therefore, the second factor weighed against a finding of fair use. (Id. at ¶ 19). With regard to the third factor, Mr. Knight noted that Plaintiff's videos used substantial portions of PWM's videos. (Id. at ¶ 21). Finally, Mr. Knight considered the

effect on the market for the PWM videos, and concluded that Plaintiff's videos were negatively impacting the market as Plaintiff's videos detracted from PWM's view count, and Plaintiff's videos hurt PWM's digital model for monetization. (Id. at ¶ 22). Thus, in Mr. Knight's mind, three of the four fair use factors weighed against a finding of fair use. (Id. at ¶ 19).

### i.   February 5, 2012

Prior to sending the "February 5, 2012 Takedown Notification," PWM received additional guidance from one of its lawyers, Dan Beirute. (Exhibit 1 at ¶ 23). As a result, Mr. Knight learned that PWM did not need to obtain a copyright registration prior to sending a Takedown Notification to YouTube because PWM owned the copyright in its videos as soon as they were fixed in a tangible medium. (Id. at ¶ 24). Thus, having reached the conclusion that Plaintiff's use of PWM's videos did not constitute fair use, in late January, 2012, Mr. Knight directed Mr. Taylor to submit a series of Takedown Notifications on behalf of PWM referencing Plaintiff's videos to YouTube. (Id. at ¶ 25).

Plaintiff alleges that on February 5, 2012, PWM made "material § 512(f) misrepresentations to YouTube stating that Plaintiff had infringed PWM's copyrights." (Doc. # 31 at ¶ 16). However, with regard to the "February 5, 2012 Takedown Notification," it appears that Plaintiff has conflated a series of Takedown Notifications sent on behalf of PWM on January 30, 2012. (Doc. # 66-1 at 140:6-25-141:1-10). Plaintiff believes that the February 5, 2012 Takedown Notification was the result of her video regarding Defendant White being wrapped in a Jewish scroll. (Id.). To support her position, she points to the newspaper article, attached to her Amended Complaint, in which the author notes that he went back to view the video in question and got a black screen, as the video had been disabled on YouTube. (See Doc. # 31-2). However, the subject Takedown Notification was submitted on January 30, 2012. (Exhibit 1 at ¶ 25). Since the "February 5, 2012 Takedown Notification" was the result of a series of Takedown Notifications submitted to YouTube on January 30 and 31, 2012, they could not have been sent in response to a February 4, 2012 "discussion

on the Don Miller radio show" or any related activity following that radio show as Plaintiff alleges. (Id.; see Doc. # 66-1 at 142:25-143:1-11).

The actual Takedown Notifications, which Mr. Taylor sent on behalf of PWM, generated a series of responses from YouTube confirming the validity of the Takedown Notifications. (Id. at ¶ 26). As a result, PWM sent a cease and desist letter to YouTube on February 2, 2012. (Id.). In response, YouTube advised that it would remove the content identified in the "February 5, 2012 Takedown Notification." (Id. at ¶ 27). The "February 5, 2012 Takedown Notification" resulted in Plaintiff's YouTube channel being taken down. (Exhibit 1 at ¶ 27). As she did not know the process to get her channel restored, Plaintiff sent a letter to YouTube on February 8, 2012. (Exhibit 4). As a result of the "February 5, 2012 Takedown Notification," and Plaintiff's delay in responding to same as she failed to initially use YouTube's counter-notification form, Plaintiff's videos were offline for roughly three months, having been restored on May 14, 2012. (Doc. # 145:4-25-146:1-3).

### ii.  May 2, 2014

As noted above, in the latter part of 2013, PWM consulted with Mr. Sadaka and asked him to assist with its efforts to enforce its copyrights in various videos of the ministry's sermons. (Exhibit 1 at ¶ 28). During his representation, Mr. Sadaka sent a Takedown Notification to YouTube, and it appears that Plaintiff submitted a counter-notice to YouTube. (Doc. ## 31-8, 31-9). As a result, YouTube gave Mr. Sadaka a period within which to notify YouTube that he filed an action seeking to restrain Plaintiff's infringing activity. (Exhibit 1 at ¶ 33). Thereafter, in March 2014, Mr. Sadaka commenced the Copyright Action. (See generally Copyright Action).

Soon after, on April 2, 2014, Mr. Sadaka provided YouTube with a copy of the Copyright Action complaint and requested that it take down the videos accused of infringing PWM's copyrights. (Exhibit 1 at ¶ 33). Mr. Taylor also followed up with YouTube on April 29, 2014, reminding YouTube of the pending litigation and providing YouTube with a list of videos to be

taken down. (Id. at ¶ 34). Plaintiff sent a counter-notice to YouTube on May 14, 2014. (Doc. # 31-10). However, since Mr. Sadaka had already advised YouTube of the commencement of the Copyright Action, on June 4, 2014, YouTube notified Plaintiff that it would not reinstate the various videos identified as containing infringing content due to the pending Copyright Action. (Id.). These videos were down from May 2014 – February 2015 (when Plaintiff notified YouTube of the dismissal of the Copyright Action). (Johnson I, Doc. # 222 at 13).

### iii.  July 1, 2014

After reviewing a video that was not included in the May 2, 2014 Takedown Notification, and after considering the fair use factors and reaching the conclusion that Plaintiff's use of PWM's videos was not fair use, in late June, 2014, Mr. Knight sent the "July 1, 2014 Takedown Notification" on behalf of PWM to YouTube, which related only to a video titled "TD Jakes and Paula White – Satanic Tongues." (Exhibit 1 at ¶ 35).

On June 25, 2014, in response to an e-mail from YouTube, Mr. Knight expressed his belief that Plaintiff's use of PWM's videos was not fair use considering "[t]he amount and substantiality of the portion used in relation to the copyrighted work as a whole." (Id. at ¶ 36). Mr. Knight also pointed out that "12 minutes of a 14 minute video are covered, which is a large extent of the work." (Id.). Mr. Knight expressed his views regarding the effect of the use on the potential market for the copyrighted work. (Id.).

Mr. Knight addressed the fair use analysis in his June 25, 2014 communications with YouTube, and those communications ultimately contributed to YouTube's decision on July 1, 2014 to take down the content. (Doc. # 31-11). As this was Plaintiff's "third strike," her entire channel was taken down. (Id.). To have her channel restored, she submitted a counter-notification. (Doc. # 66-1 at 107:24-25-108:1-16). The channel was restored after the Copyright Action was dismissed.

(Id. at 109:7-25-110:1-6). In total, her YouTube channel was down from July 1, 2014 – February 10, 2015. (Id.).

### iv.   March 6, 2015

Around March 2015, PWM sought legal assistance with one of Plaintiff's videos, entitled "Paula White Sacrifices Chickens – amended," which PWM believed had been amended since the "May 2, 2014 Takedown Notification." (Exhibit 1 at ¶ 37). At that time, Mr. Knight sought guidance from Vanessa L. Braeley, another attorney who was then with NeJame Law. (Id. at ¶ 38).

Ms. Braeley reviewed the video, statutes, and case law to ensure that she properly evaluated whether there was a good faith basis for claiming that Plaintiff's use of PWM's videos infringed PWM's copyrights. (Exhibit 5 at ¶ 6). In the course of doing so, she considered the fair use factors under § 107. (Id. at ¶ 7). While analyzing Plaintiff's use of PWM's videos, Ms. Braeley noticed Plaintiff's hatred for Defendant White. (Id. at ¶ 8). It appeared to Ms. Braeley that Plaintiff's video was "ill-intended" and that PWM's videos had been used in bad faith. (Id. at ¶ 9). Ms. Braeley factored Plaintiff's apparent bad faith into the fair use analysis, and ultimately concluded that Plaintiff's bad faith tended to negate the notion that any use of PWM's videos was a fair use. (Id. at ¶ 10). Having concluded that Plaintiff's use was not a fair use, Ms. Braeley submitted the "March 6, 2015 Takedown Notification" to YouTube. (Id. at ¶ 11). In response, Plaintiff sent a counter-notice on April 22, 2015, and YouTube restored the videos. (Doc. # 31-14). The video was restored within about 24 days. (Doc. # 66-1 at 96:15-25-97:1-6).

### v.   May 20, 2015

On or about May 20, 2015, Mr. Knight sent the last of the Takedown Notifications at issue to YouTube, which focused on a video titled "Paula White Married Jonathan Cain." (Exhibit 1 at ¶ 40). Prior to sending this Takedown Notification, Mr. Knight considered the fair use factors and formed a good faith belief that Plaintiff's use of PWM's video was not fair use. (Id. at ¶ 41). Plaintiff

sent a counter-notice on May 22, 2015. (Doc. # 31-15). YouTube restored the video at issue on June 5, 2015. (Exhibit 6).

All together, Plaintiff alleges that her YouTube channel was terminated for a total of ten (10) months. (Doc. # 66-1 at 158:16-25-159:1-4).

As discussed more fully, *infra*, Defendants are entitled to summary judgment as a matter of law as to Plaintiff's § 512(f) claim, and limited abuse of process claim.

## III.  Legal Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To defeat a motion for summary judgment, the nonmoving party must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006).

## IV.  Analysis

### a.  Plaintiff has Failed to Establish her § 512(f) Claim Through Competent Evidence

Plaintiff's claim that Defendants made knowing misrepresentations is based on speculation and a misunderstanding of the law. As to the latter, Plaintiff misapprehends that Defendants had to register their material with the United States Copyright Office before sending its Takedown Notifications and that fair use had to be considered before the Takedown Notifications were sent. Moreover, Plaintiff believes fair use can be established by only one criteria having been met, when instead it is a defense to be established by having all the factors considered together. Yet, even if Plaintiff were correct that fair use had to be taken into account, the relevant inquiry for a § 512(f) case is whether the party seeking the Takedown Notification had a *subjective* good faith belief that

its copyright was being infringed. Here the indisputable evidence shows that Defendants did, and Plaintiff has presented no evidence to the contrary.

### i. 512(f) Claim

17 U.S.C. 512(f) provides:

> (f) MISREPRESENTATIONS.—Any person who knowingly materially misrepresents under this section—
>> (1) that material or activity is infringing, or
>> (2) that material or activity was removed or disabled by mistake or misidentification
>
> shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f).

> [s]ection 512, Title 17, of the United States Code lays out a detailed process allowing a copyright owner who observes infringing content on a website like YouTube to have the content taken down. Under the statute, the copyright owner must send a written communication to the service provider identifying the offending video and asserting under penalty of perjury that the sender is the copyright owner and has a good faith belief that the video infringes the sender's copyright.

Big Cat Rescue Corp. v. Big Cat Rescue Entm't Grp., No. 8:11-cv-2014-JDW-TBM, 2013 WL 12158980, at *10 (M.D. Fla. Jan 15, 2013). In turn, subsection (f), "sets out a private cause of action for anyone who is injured by a material representation that content or activity is infringing when it is not." Disney Enters., Inc. v. Hotfile Corp., No. 11-20427-CIV, 2013 WL 6336286, at *46 (S.D. Fla. Sept. 20, 2013).

To state a claim for misrepresentation under § 512(f), Plaintiff must allege that Defendants "knowingly and materially misrepresent[ed]" that copyright infringement has occurred, that YouTube "relied" on such misrepresentations, and that Plaintiff has been "injured" as a result. See 17 U.S.C. § 512(f). "[K]nowingly means that a party actually knew, should have known if it acted

with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations." <u>See</u> <u>Online Policy Grp. v. Diebold, Inc.</u>, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004)(citing Black's Law Dictionary (8th ed. 2004)(definitions of "knowledge," in particular, "actual" and "constructive" knowledge)).

To support her claim that Defendants "knowingly misrepresented" copyright infringement to YouTube, Plaintiff avers that (1) on multiple occasions, PWM/NDCC "willfully, knowingly, and materially" made § 512(f) misrepresentations to YouTube that her videos were infringing PWM's copyrights; (2) "PWM did not hold a valid copyright registration or certificate to the content contained in [Plaintiff's] videos at the time of the misrepresentations;" and (3) the material posted on Plaintiff's YouTube channel "was used lawfully in accordance with 17 U.S.C. § 107 of the Copyright Act" – the fair use doctrine. (Doc. # 31 at ¶¶ 13, 20, 33, 37, 40).

### ii.  <u>Valid Copyright</u>

Plaintiff's allegation that PWM "willfully, knowingly and materially misrepresented that it owned copyrights to some of the content in Plaintiff's videos" (Doc. # 31, ¶ 18) is patently incorrect. "Registration is not a condition of copyright protection." 17 U.S.C. § 408(a). Rather, copyright protection inures at "the moment an original idea leaves the mind and finds expression in a tangible medium, be it words on a page, images on a screen, or paint on a canvas." <u>Big Cat</u>, 2013 WL 12158980 at *2 (internal citations omitted).

### iii.  <u>Fair Use</u>

The fair use doctrine is an affirmative defense that can excuse what would otherwise be an infringing use of copyrighted material. <u>See</u> <u>Latimer v. Roaring Toyz, Inc.</u>, 601 F.3d 1224, 1239 (11th Cir. 2010)("determining that the "fair use of copyrighted work is an affirmative defense and should be pleaded as such."). "To prevail on a claim of fair use, a defendant must convince the court that allowing his unpaid use of copyrighted material would be equitable and consonant with the

purposes of copyright." <u>Cambridge Univ. Press v. Patton</u>, 769 F.3d 1232, 1238 (11th Cir. 2014). In order to make this determination, the court must carefully evaluate the facts of the case at hand in light of the four considerations set forth in 17 U.S.C. § 107. <u>See</u> 17 U.S.C. § 107.

### 1. Fair Use Requirement for Takedown Notifications

Prior to September 14, 2015, the date of the Ninth Circuit's opinion in <u>Lenz v. Universal Music Corp.</u>, 801 F.3d 1126 (9th Cir. 2015), senders of Takedown Notifications were not required to consider fair use for purposes of determining whether the "use of the material in the manner complained of is not authorized by . . . the law." Prior to that time, no appellate court had interpreted the requirements of § 512 to include fair use. Indeed, appellate courts which had considered the requirements of § 512 had focused on the requirement that the sender of a notice have "a good faith belief that the use of the material in the manner complained of is not authorized" and whether an objective or subjective standard applies when a party accuses another of infringing; such courts concluded that Congress intended that a subjective standard apply. <u>See</u> <u>Rossi v. Motion Picture Ass'n of America, Inc.</u>, 391 F.3d 1000, 1002 (9th Cir. 2004). In September 2015, the Ninth Circuit held that fair use was an authorization under the law, and thus, fair use had to be considered before sending a Takedown Notification in order to state that "the complaining party has a good faith belief that the use of the material in the manner complained of is *not authorized by . . . the law*." <u>Lenz</u>, 815 F.3d at 1151-53 (emphasis supplied).

The lack of clear guidance prior to September 2015 is further reflected on YouTube's website. In early 2012 – shortly before the submission of any of the Takedown Notifications at issue – YouTube's "Copyright Infringement Notification" page provided information about submitting a Takedown Notification, but made no mention of a requirement to consider fair use. (Exhibit 7). In contrast, YouTube's <u>current page</u> for submitting a Takedown Notification expressly cautions people to "consider whether fair use . . . applies" before submitting the notice. (Exhibit 8).

## 2.  <u>Defendants Considered Fair Use</u>

The case of <u>Stern v. Lavender</u>, 319 F. Supp. 3d 650 (S.D.N.Y. 2018) is instructive. In <u>Stern</u>, the plaintiffs moved for summary judgment on the Lavenders' counterclaim that alleged that, under 17 U.S.C. § 512(f), the plaintiffs, through counsel, in sending takedown notices to eBay, knowingly and materially misrepresented, in bad faith, to eBay that the Lavenders' posting of works for sale on eBay was infringing a Stern copyright. <u>Id.</u> at 683. Relevant to the <u>Stern</u> court was the following complete defense to a claim under § 512(f): the party issuing a takedown notice had a subjective good faith belief that the use in question was "not authorized." <u>Id.</u> (citing <u>Hosseinzadeh v. Klein</u>, 276 F. Supp. 3d 34, 44 (S.D.N.Y. 2017)("A copyright holder is not liable for misrepresentation under the DMCA if they *subjectively* believe the identified material infringes their copyright, even if that belief is ultimately mistaken.")(emphasis added)).

The <u>Stern</u> court determined that the evidence "uniformly supported plaintiffs' defense of good faith." <u>Id.</u> at 684. The court found critical that the Lavenders had not supplied a factual basis on which to find that the plaintiffs, in pursuing takedown notices, made a knowing material misrepresentation. <u>Id.</u> Thus, the court determined that the plaintiffs' claim of copyright infringement was clearly colorable. <u>Id.</u> In making its finding, the court explained:

> while the facts as to whether . . .Stern had given away certain items and authorized certain posthumous actions are disputed, the Trust had sound reason to conclude that he had not done so and that the Lavenders do not own the objects they were offering for sale. If so, the Lavenders' display of photographs of those objects incident to the offer of them of sale would necessarily violate plaintiffs' copyright (as those displays would no longer be fair use because they would not be in service of lawful sales). For the Trust to assert this position did not evince bad faith or entail the making of a material misrepresentation.

<u>Id.</u> The <u>Stern</u> court entered summary judgment for the plaintiffs on the Lavenders' counterclaim. <u>Id.</u>

Here, regardless of their motivation for undertaking the analysis, it is clear that Mr. Knight, Mr. Sadaka, and Ms. Braeley each considered the fair use factors prior to sending the Takedown

Notifications at issue. (See Exhibit 1, 3, 5). Upon due consideration, each concluded that Plaintiff's use of PWM's videos was not fair use. (Id.). While it is possible that Plaintiff or the Court would reach a different conclusion, what is important is that Ms. Braeley, Mr. Knight, and Mr. Sadaka formed a *subjective* good faith belief.  Plaintiff has not come forward with any independent evidence establishing that Ms. Braeley, Mr. Knight, or Mr. Sadaka failed to undertake a fair use analysis and/or did not have a subjective good faith belief prior to submitting any of the Takedown Notifications at issue. Indeed, Plaintiff indicated at her deposition that it was simply her belief that each of these individuals either failed to undertake a fair use analysis or turned a blind eye to the fair use issue because they did not reach the same conclusion as she had when deciding to copy and use portions of PWM's videos. (Doc. # 66-1 at 97:7-15). As such, Defendants are entitled to summary judgment on Plaintiff's § 512(f) claim as a matter of law.

   **b.  <u>Abuse of Process Claim</u>**

   An abuse of process claim involves the use of the civil process against another to accomplish a purpose for which it was not designed. <u>Scozari v. Barone</u>, 546 So. 2d 750 (Fla. 3d DCA 1989). Here, Plaintiff has focused her abuse of process allegations to those surrounding Defendants' continued prosecution of the Copyright Action and alleged use of the judicial system for an improper purpose of obtaining the permanent termination of Plaintiff's channel by YouTube. (Doc. # 31 at 11-12). Specifically, she has argued that following the § 512(f) misrepresentations, PWM/NDCC "continued the previous fabricated copyright infringement action against Plaintiff with the ulterior motive of using (or misusing) the Judicial System to intimidate, punish, shame, harass and attempt to extort millions of dollars from Plaintiff." (Id. at ¶ 58). Ultimately, Plaintiff contends that Defendants used the DMCA takedown process to "remove evidence," not "for a matter of copyright infringement as falsely alleged." (Id. at ¶ 57).

It should be noted that in <u>Johnson I</u>, as to her claim for malicious prosecution, Plaintiff also claimed that the defendants "brought the previous action with the ulterior motive of using (or misusing) the Judicial System to intimidate, punish, shame, harass and attempt to extort millions of dollars from Plaintiff." (<u>Johnson I</u>, Doc. # 76 at ¶ 77). That validity of that matter has already been heard by this Court. Thus, the only remaining claim for abuse of process in this action is premised on Plaintiff's contention that Defendants used the Copyright Action to procure the permanent deletion of her YouTube channel and videos. (<u>See</u> Doc. # 30 at 10-12). However, as set forth below, her limited abuse of process claim is preempted by the DMCA and her § 512(f) claim.

Section 512 limits liability for copyright infringement by creating safe harbors for internet service providers that follow certain detailed procedures. (<u>See generally</u> 17 U.S.C. § 512). One such safe harbor is found in Section 512(c), "which insulates service providers from liability for infringements of which they are unaware, contained in material posted to their sites by users, so as to make it commercially feasible for them to provide valuable Internet services to the public." <u>Capitol Records, LLC v. Vimeo</u>, LLC, 826 F.3d 78, 82 (2d Cir. 2016). This section also "augments the rights of copyright owners by establishing a notice-and-takedown regime." <u>Id.</u> at 83. Through that process, those who believe an internet service provider, such as YouTube, is hosting material that infringes on their copyright can submit a formal takedown notice, and the provider loses the benefit of the safe harbor if it continues to host the allegedly infringing material. <u>See</u> 17 U.S.C. § 512 (c). The DMCA also provides remedies for posters who believe their material has been taken down incorrectly. (<u>See</u> 17 U.S.C. §§ 512(g) and (f))

Under the Supremacy Clause of the Constitution, federal law "shall be the supreme Law of the Land," meaning that when state laws threaten the supremacy of federal law, they are "preempted" and must give way. <u>See</u> U.S. Const. art. VI, cl. 2. Several courts have held that the remedial provisions of the DMCA preempt state claims, such as intentional interference with

contract, based on the wrongful use of DMCA takedown notices. See Online Policy Grp., 337 F. Supp. 2d at 1205 ("In section 512(f), Congress provides an express remedy for misuse of the DMCA's safe harbor provisions. It appears that Congress carefully balanced the competing interests of copyright holders, ISPs, and the public, by providing immunity subject to relief for any misuse of the statute."); Amaretto Ranch Breedables, LLC v. Ozimals, Inc., No. C 10-05696, 2011 WL 2690437, at *4 (N.D. Cal. July 8, 2011)("[A] DMCA Takedown Notification is a creature of a federal statutory regime, and that regime preempts any state law claim based on an allegedly improper DMCA Takedown Notification."); Lenz v. Universal Music Corp., No. C 07-03783, 2008 WL 962102, at *4 (N.D. Cal. Apr. 8, 2008)("[G]iven that a special provision of the Copyright Act itself regulates misrepresentations in [DMCA Takedown Notifications, [Section 512(f) ] constitutes the sole remedy for a customer who objects to its contents and their effects.").

Based on Plaintiff's deposition testimony, her abuse of process claim is based on the same conduct governed by § 512, and she seeks remedies beyond those afforded under § 512. (See generally Doc. # 66-1). Namely, Plaintiff testified that after PWM filed the Copyright Action, PWM sent additional Takedown Notifications to YouTube in order to bring Plaintiff's YouTube channel down during the Copyright Action. (Id. at 190:10-17). Such testimony is consistent with Plaintiff's allegations that PWM used Takedown Notifications "for an improper purpose of obtaining the permanent termination of Plaintiff's" YouTube channel, and that the Takedown Notification was used "with the ulterior motive of removing evidence" of certain activities. (Doc. # 31 at ¶ 56). Plaintiff has also confirmed that her abuse of process claim would have been part of Johnson I, "if [she] had known what [she] was doing." (Doc. # 66-1 at 191:8-15). Similarly, Plaintiff includes certain allegations in her abuse of process claim that relate specifically to the subject matter of Johnson I. (Doc. # 31 at 11-12).

Even assuming that there is some truth in Plaintiff's abuse of process allegations, the allegations still arise from the procedures enacted by the DMCA and implicate remedies beyond those which are available under § 512. See Online Policy Grp., 337 F. Supp. 2d at 1205–06 (If adherence to the DMCA's provisions simultaneously subjects the copyright holder to state tort law liability, there is an irreconcilable conflict between state and federal law). Just as in Online Policy, even if the state claims are based upon misrepresentation of rights under § 512, it does not alter the fact that "Congress provide[d] an express remedy for misuse of the DMCA's" takedown procedures. Id. at 1206. Accordingly, Plaintiff's abuse of process claim is preempted by the DMCA and her claim under § 512(f).

Even if the Court determines that Plaintiff's abuse of process claim is not preempted by the DMCA and her claim under § 512(f), her abuse or process claim must still fail. Her abuse of process claim is premised on the argument that Defendants improperly used the judicial system – in filing the Copyright Action – in order to have her YouTube videos taken down. However, based on the arguments above, the record evidence shows that the Takedown Notifications – or the subsequent litigation – were not done maliciously.

### c. Defendant White Not Involved in Takedown Process

In Johnson I, the Court made the following findings as to Defendant White's involvement:

> Beyond preaching, White is the president of New Destiny Christian Center. She delegates various responsibilities to others involved in her organization, including day-to-day operations, day-to-day management, and working with attorneys. White's son, Brad Knight ("Knight"), served as Operations Manager of the Paula White Ministries ("PWM"), and is now employed on a contract basis with New Destiny Christian Center. Knight handles issues involving YouTube and the online presentation and distribution of White's sermons.
>
> * * *
>
> White's involvement in the Copyright Action was limited. On being told by her son that a lawsuit against Johnson was "the only way we could pursue what we wanted to do with YouTube," White "gave [Knight] the authority to do what [he] thought was best, and [he] proceeded." The Court accepts Knight's testimony that White had

minimal involvement in the Copyright Infringement Action, but that he sought her authorization before initiating it.

(Johnson I, Doc. # 264 at 5, 7)(internal citations omitted). As previously found in Johnson I, Defendant White had no direct involvement with issues involving YouTube; and as a result, had no direct involvement in the relevant Takedown Notifications, as she delegated such tasks to Mr. Knight. Furthermore, Defendant White had minimal involvement in the Copyright Action, which is the basis of Plaintiff's abuse of process claim. Accordingly, as she was not directly involved in the actions giving rise to Plaintiff's claims, Defendant White cannot be held personally liable for Plaintiff's § 512(f) and abuse of process claims.

### d.   Insufficient Evidence for Plaintiff's Punitive Damages Claim to Proceed to Trial

In addition to actual damages, [5] [6] Plaintiff seeks punitive damages; however, based upon the section's express language, punitive damages are not recoverable under § 512(f). (See Doc. ## 31, 49-5). The express language provides that the misrepresenting party is liable for damages incurred by the alleged infringer. 17 U.S.C. § 512(f). Punitive damages are not damages that a party incurred – rather, they are damages intended to punish or deter future conduct. See Mercury Motors Express, Inc. v. Smith, 393 So. 2d 545 (Fla. 1981)("Punitive damages are imposed in order to punish the defendant for extreme wrongdoing and to deter others from engaging in similar conduct").

By way of analogy, under 17 U.S.C. § 504, punitive damages are not available for copyright infringement. Section 512 (f) falls within Title 17 of the United States Code, which outlines United

---

[5] Plaintiff testified that she has not suffered any monetary loss because of her YouTube channel being taken down. (Doc. # 66-1 at 3-22). However, Plaintiff contends she sustained $250 in economic damages in getting her YouTube channel restored. (Id. at 21:3-22; 153:3-12). These damages encompass costs incurred for (1) postage; (2) electricity; and (3) making telephone calls related to responding to the Takedown Notifications. (Id. at 60:4-10; 96:3-12; 146:4-25). Plaintiff does not have any receipts to support these damages. (Id. at 154:3-18).

[6] Plaintiff also claims that she sustained injury to her character and reputation as a result of the Takedown Notifications. (Id. at 155:6-14). When asked about such damages, Plaintiff claimed, "Well, anytime someone is falsely accused of something, that's going to automatically reflect negatively on that person's character and it is going to tarnish their reputation." (Id. at 155:15-18). She has no documentation to support this claim, rather, she claims it is "a given." (Id. at 155:19-25 – 156:1-7). Plaintiff could not provide the name – other than herself – of "anyone who has felt that [her] character and reputation was lessened as a result of the takedown notices." (Id. at 156:8-25). As in Johnson I, Plaintiff has no evidence to support such damages claim. (Johnson I, Doc. # 264 at 15-16).

States Copyright Law. Chapter 5 of Title 17 relates to Copyright Infringement and 17 U.S.C. § 504 relates to remedies available for infringement, specifically damages and profits. <u>See</u> 17 U.S.C. § 504(a) and (d). Section 504 does not provide for the recovery of punitive damages. <u>See</u> <u>Calio v. Sofa Express, Inc.</u>, 368 F. Supp. 2d 1290, 1291-92 (M.D. Fla. 2005)("based on the express language of the 17 U.S.C. § 504(a), which sets forth the remedies for copyright infringement, and the prevailing case law interpreting this language, this Court finds that punitive damages are not a remedy available under the Copyright Act."). As such, if a copyright infringer is not liable for punitive damages under § 504, a party making a misrepresentation under § 512(f) should similarly not be liable for punitive damages, particularly based upon the express language of § 512(f) that only makes a misrepresenting party liable for damages that the alleged infringer *incurred* as a result of the violation of the statute.

As it relates to her abuse of process claim[7] (and in the event the Court finds punitive damages available for a § 512(f) claim), under Florida law, "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." FLA. STAT. § 768.72(2). In order to support an award of punitive damages, there must be "a showing of willful and wanton disregard of plaintiff's rights, excessive or reckless disregard of plaintiff's rights, or any other outrageous conduct." <u>Jack Eckerd Corp. v. Smith</u>, 558 So. 2d 1060, 1064 (Fla. 1st DCA 1990). The Florida Supreme Court has guided courts that "the allowance of punitive damages depends on malice, moral turpitude, wantonness, or the outrageousness of the tort." <u>St. Petersburg Sheraton Corp. v. Stuart</u>, 242 So. 2d 185, 188 (Fla. 2d DCA 1970).

---

[7] Assuming arguendo that the Court finds that Plaintiff's abuse of process claim is not preempted as Defendants argued, *supra*.

A motion for partial summary judgement as to punitive damages is procedurally proper when the plaintiff has not presented sufficient evidence to support the standard for awarding punitive damages. See Morrison v. Mann, 271 F. App'x 841, 845 (11th Cir. 2008)(affirming the grant of partial summary judgment on the plaintiffs' punitive damages claim "because there was no evidence to support the claim that [the defendants] acted in a malicious, wanton, or willful manner"); Hutcherson v. Progressive Corp., 984 F.2d 1152, 1155–56 (11th Cir. 1993)(affirming the grant of partial summary judgment on plaintiff's punitive damages claim because "no evidence existed to support a finding that [the defendant] had been consciously indifferent").[8] Here, there is no genuine issue of material fact as to Plaintiff's entitlement to punitive damages as Plaintiff has failed to overcome Defendants' evidence that they did not act in a malicious, wanton, or willful manner. (See Exhibit 1, 3, 5).

## V. Conclusion

The record evidence does not support Plaintiff's speculation that Defendants made material misrepresentations to YouTube when they submitted – through Mr. Sadaka, Mr. Knight, and Ms. Braeley – the Takedown Notifications in question and/or that Defendants improperly utilized the judicial system in filing the Copyright Action, which resulted in her YouTube channel being taken down. Plaintiff's theory of liability is based purely on conjecture. As a result, Defendants respectfully request the Court enter final summary judgment in their favor and against Plaintiff as to her § 512(f) and abuse of process claim. In the event the Court declines to grant summary judgment as to liability, Defendants respectfully request the Court enter partial summary judgment as to Plaintiff's request for punitive damages.

---

[8] In Morrison and Hutcherson, the Eleventh Circuit interpreted the standard for awarding punitive damages under Georgia law and not Florida law. However, these cases are cited for the proposition that a motion for partial summary judgment is properly granted in courts within the Eleventh Circuit when the plaintiff fails to present sufficient evidence establishing that she is entitled to an award of punitive damages.

Dated:  November 1, 2018

Respectfully submitted,

*/s/ Clay H. Coward*_____
Richards H. Ford, Esquire (0288391)(Trial Counsel)
RFord@wickersmith.com
Clay H. Coward, Esquire (379522)
CCoward@wickersmith.com
Krista N. Cammack, Esquire (0104718)
KCammack@wickersmith.com
WICKER SMITH O'HARA MCCOY & FORD, P.A.
390 N. Orange Ave., Suite 1000
Orlando, FL 32801
Telephone:      (407) 843-3939
Facsimile:      (407) 649-8118
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2018, I electronically filed the foregoing with the Clerk of the Court by using the ECF system, which will send a notice of electronic filing to all counsel of record. I further certify that a true and correct copy of the foregoing has been furnished via U.S. Mail to:

**Shirley Jn Johnson**
P.O. Box 58818
Seattle, WA 98138
*Pro Se*

*/s/ Clay H. Coward*
Clay H. Coward, Esquire